# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 04, 2014 Session

## STATE OF TENNESSEE v. DEVON BROWN

**Appeal from the Criminal Court for Shelby County**
**No. 1102623, 1107432      Lee V. Coffee, Judge**

---

**No. W2013-00182-CCA-R3-CD  -  Filed September 5, 2014**

---

A Shelby County Jury returned an indictment against Defendant, Devon Brown, Defendant's brother, Kenneth Brown, and David Richardson, charging them with first degree premeditated murder, thirteen counts of attempted first degree murder, thirteen counts of aggravated assault, one count of employing a firearm during the commission of a dangerous felony, and one count of reckless endangerment. Orders of dismissal were entered as to one count of attempted first degree murder and one count of aggravated assault. He was convicted of the lesser-included offense of facilitation of employing a firearm during the commission of a dangerous felony. He was convicted as charged of the remaining offenses. The trial court imposed a sentence of life imprisonment for first degree murder and imposed a mid-range sentence for each of the remaining convictions. The court merged the convictions for aggravated assault into the convictions for attempted first degree murder. The trial court further found Defendant to be a dangerous offender and ordered all sentences to run consecutively for an effective sentence of life plus two-hundred and forty-four years in confinement. On appeal, Defendant argues: (1) that the trial court erred in denying the motion to suppress his statement; (2) that the evidence was insufficient to support his convictions for first degree murder and the attempted first degree murder and aggravated assault of Kenneth Baker and Chymia Baker; and (3) that the trial court improperly sentenced him by ordering his sentences to be served consecutively. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Stephen C. Bush, District Public Defender; Tony Brayton, Assistant Public Defender; Dianne Thackery, Assistant Public Defender; and Michael Jackson, Assistant Public Defender, Memphis, Tennessee, for the appellant, Devon Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; Theresa McCusker, Assistant District Attorney General; and Alycia Carter, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

*Suppression Hearing*

Sergeant William Merritt of the Memphis Police Department, Homicide Squad, testified that Defendant was developed as a suspect in Kimberly Jamerson's death after an interview with David Richardson, an accomplice in the case. Sergeant Merritt testified that he contacted Defendant's mother, and she and Defendant voluntarily came to the homicide bureau office on July 5, 2010, at approximately 1:30 p.m. Sergeant Merritt testified that Defendant, who was nineteen years old, was not under arrest at the time, and he directed Sergeants Brown and Moses to obtain information from Defendant. Although he was not under arrest, Defendant was advised of his *Miranda* rights. Sergeant Merritt later advised Defendant of his rights a second time.

Sergeant Merritt testified that he had learned through Sergeant Brown that Defendant had provided an alibi statement. He directed Sergeant Brown and Sergeant Moses to follow up on the information. Concerning the information, Sergeant Merritt testified:

I learned from Sgt. Brown that [Defendant] had provided the name of a female girlfriend as his alibi witness for July the 4th. I instructed Sgt. Brown to follow up on that information to see if he could make contact with this female in order to confirm or deny the alibi. I knew it was important to this case. Sgt. - - I learned that Sgt. Brown had made contact with the female, the female's mother. This female was a juvenile. The mother agreed to bring the female down to the Homicide Office a little bit later on.

That evening, I learned that the female was not able to corroborate [Defendant's] alibi that he was with her, and I learned that he had actually asked her to say that they were together if she had been asked by the police.

-2-

Based on that information, myself and Sgt. Brown sat down with [Defendant]. We advised him of his rights at that point again and obtained a statement from him.

Sergeant Merritt testified that Defendant was calm and cooperative at the time. He said that Defendant was not under the influence of anything and that Defendant had "been at our office for a while waiting for us to talk to him, waiting for us to follow up on his alibi, and that's, you know, what we were doing while he was up there." Sergeant Merritt testified that Defendant was not forced to make a statement and that he came to the homicide bureau office voluntarily with his mother. He said that if Defendant had refused to give a statement at any time the interview would have stopped. Sergeant Merritt could not recall if Defendant was offered anything to eat or drink but he noted that Defendant "would have been offered restroom breaks, and you know, probably something to drink if he had asked."

Sergeant Merritt testified that Defendant gave a typed statement at 7:50 p.m. on July 5, 2010. The statement was signed by Defendant at 8:25 p.m. Concerning the statement, Sergeant Merritt testified as follows:

[Defendant] told us that he traveled to the location where the shooting occurred with his brother and with the accomplice that had implicated him. He told us that he was armed with a shotgun, that he fired three rounds into the air. He told us about the weapons the other two individuals had. He told us one of the individuals was armed, or he said "Dave" - - he told us that "David was armed with a revolver," and he said "Ken," which would be Kenneth Brown, "was armed with a chopper," which is street lingo for some type of assault rifle. He told us that they traveled to the residence or to the location where the shots were fired in a green Chevy Lumina and that this whole thing kind of centered on a fight that Kenneth and the accomplice had been in earlier that day.

Defendant reviewed the statement and signed it. Sergeant Mike Brown was present for the statement, and it was typed by Penny Brown. Sergeant Merritt testified that Defendant never asked for an attorney, and a forty-eight hour hold was placed on him in order for the case to be reviewed by a "prosecutor from the Attorney General's Office."

On cross-examination, Sergeant Merritt admitted that the arrest ticket indicated that Defendant was under arrest at 1:30 p.m. on July 5, 2010. However, Sergeant Merritt testified that Defendant was not under arrest at the time and that the ticket actually reflected the time when Defendant arrived at the homicide bureau office. He said that Defendant was not placed under arrest until he gave the statement. Sergeant Merritt testified that Defendant was

free to leave when he initially arrived at the office with his mother. Sergeant Merritt also admitted that the forty-eight hour hold document also reflected that Defendant was arrested at 1:30 p.m. on July 5, 2010. Concerning the time of Defendant's arrest, Sergeant Merritt testified:

> [Defendant] was not handcuffed at that point. He - - we were getting information from him in order to verify his story because if we have an alibi witness that can completely clear his name, then that's good for him. He doesn't have to be taken into custody, he doesn't have to be charged, and we're obligated to check his side of the story, just like were obligated to check the Co-Defendant's side of the story. We're trying to either verify or refute the information that the Co-defendant told us, and that would be to speak with the alibi witness, and the alibi did not hold up.

Sergeant Merritt thought that the time of 1:30 was "either a typographical error or there may have been a co-worker that typed this information here in the top, and I should have checked it closer and that's my mistake." Sergeant Merritt reiterated that Defendant was not placed under arrest until he admitted that he was involved in the shooting and that he had a shotgun at the time.

Sergeant Merritt testified that they knew David Richardson had ties to Defendant's family. He noted that the green Lumina belonging to Defendant's mother was found at Mr. Richardson's home. Defendant's mother's cell phone number was found in Mr. Richardson's phone, and Mr. Richardson identified photographs of Defendant and Defendant's brother, Kenneth Brown. Sergeant Merritt testified that Mr. Richardson admitted to his involvement in the shooting.

Sergeant Michael Brown of the Memphis Police Department's Homicide Bureau testified that he and Sergeant Moses spoke with Defendant and his mother, Cynthia Brown, on July 5, 2010. He said that Defendant had a "calm, nice demeanor." Sergeant Brown testified that Defendant would have been given food, water, or a break if he had asked for one. He advised Defendant of his *Miranda* rights, and Defendant waived those rights at 2:37 p.m. on July 5, 2010.

Defendant initially told Sergeant Brown and Sergeant Moses that he had heard about the fight and the shooting, but he was not present for either event. Defendant claimed that he was with his girlfriend, "Tanesha," at the time. He also gave them Tanesha's phone number. Sergeant Brown testified that he called Tanesha who indicated that Defendant was not with her and that he had "called her and advised her if the police call her and ask her

anything about the weekend or was he with her, to tell them that he was with her over the weekend." Tanesha and her mother then came to the homicide office and gave a statement.

Sergeant Brown then notified Sergeant Merritt and Defendant that the alibi had been refuted. Defendant immediately indicated that he wanted to tell the truth. He then told investigators that he was present for the shooting and was firing a shotgun. Sergeant Brown testified that Defendant remained calm during the entire statement, and he gave it freely. He said that Defendant never asked for an attorney.

On cross-examination, Sergeant Brown testified that Defendant was placed under arrest after his alibi was refuted and after he admitted to being involved in the shooting. He thought that a shackle was placed on Defendant at that time. Sergeant Brown testified that Defendant was detained while his alibi was being investigated.

*Trial*

On July 3, 2010, the victim, Kimberly Jamerson, was murdered by Defendant, Kenneth Brown, and David Richardson at her aunt's house located at 2706 Northmeade Avenue in Memphis. Robrecus Braxton testified he lived at 2706 Northmeade with his mother (Sonja Watkins), his step-father (Felix Williams), his two brothers (Christopher Braxton and Kevin Nevels), and his two sisters (Dakarrionah and Amber Laury). Mr. Braxton testified that he was at home on July 3, 2010, with several individuals including his uncles, Nakia Greer and DiAngelo Smith, and his cousins, Kenneth Baker, Chymia Baker, Jalon Baker, and Lashanna Jones, preparing for a fourth of July celebration. Mr. Braxton estimated that ten to fifteen people were present. Mr. Braxton testified that he went to the store later that day, and a green Chevrolet Lumina pulled up at the residence sometime after Mr. Braxton returned. Two males, Kenneth Brown and David Richardson, whom Mr. Braxton had seen around the neighborhood, got out of the vehicle. Mr. Braxton testified that the two men approached Mr. Braxton's step-father (Mr. Williams), and Mr. Braxton's uncle, Nakia Greer. The two men indicated that someone at the residence had taken some marijuana from them. Mr. Williams told Mr. Kenneth Brown and Mr. Richardson that the person who took the marijuana was not there at the time and to come back later while he sorted out the problem.

Mr. Braxton testified that the two men left but returned five to seven minutes later with a third person, Defendant, who was sitting in the back seat of the Lumina. The three men stepped out of the vehicle, and Mr. Williams talked to the men and said, "She don't live here," referring to Mr. Braxton's aunt, Dena Watkins. Mr. Williams gave the driver of the car five dollars to "keep the situation down." Mr. Braxton testified that he walked over to the side of the car, and it suddenly pulled away nearly clipping Mr. Braxton's knees. Mr.

Braxton then threw a beer at the vehicle which stopped on Ladue Street. The three men got out of the car and began fighting with Mr. Braxton, Christopher Braxton, and Kenneth Baker. No weapons were involved in the fight, which lasted approximately ten minutes until Mr. Williams and Mr. Greer stepped in and stopped the fight. Mr. Braxton testified that before the three men left, they said, "All right. That's what's up. That's what's up," which Mr. Braxton took as a threat.

Approximately two to three hours later, Mr. Braxton was standing under the carport when he heard bottle rockets exploding, and then numerous gunshots. Mr. Braxton ran through a path to the back yard. He saw one of his friends, Lamarcus, get shot, and he heard bullets strike a Dodge Durango parked in the driveway. Mark and Steve Chambers each had a gun at the time and fired shots back at the original shooters. Mr. Braxton estimated that the shooting continued for "about ten minutes." He then heard Rodney Davenport say that the victim, Kimberly Jamerson, who was Mr. Braxton's cousin, had been shot. Mr. Braxton walked across the yard to the area where the victim was lying on the sidewalk.

Mr. Braxton testified that one of his friends, Antoine Moore, grabbed Mr. Braxton's arm, and they left in a car with another friend. They found an undercover police officer and told him that the victim had been shot. The officer then drove to the scene where other officers had already arrived. They would not allow Mr. Braxton back in the area. The following day, a detective picked Mr. Braxton up and transported him to the police department. Mr. Braxton was shown a photographic line-up, and he identified Kenneth "Kenny" Brown, Defendant's brother, as the person that he was fighting with at Mr. Braxton's house on Northmeade Avenue.

Felix Williams testified that he was living at 2706 Northmeade Avenue on July 3, 2010. On that day, Mr. Williams picked up his daughter and returned home to prepare for the fourth of July holiday. He said that in addition to his family that lived at the residence, there were "a lot of visitors, nieces and nephews." Mr. Williams testified that at some point that evening, the following took place:

> My sister-in-law, Dena Watkins, inquired about some marijuana, and her play brother, Nakia, stopped one of the - - one of the guys he know [sic] from the neighborhood. And they made - - they conversating [sic], and he left, and Kenneth Brown came back. And when he came back, he pulled down to the other drive - - to the next - - next door to my house, to the other driveway. And Kenneth Brown and Dena Watkins met one another and walked down the side of the van, and they reappeared. He got back in his car, pulled off. She got in her car and she pulled off. She went to the store.

-6-

Mr. Williams testified that Kenneth Brown and David Richardson were in the car when it returned fifteen to twenty minutes after Ms. Watkins left. Mr. Brown asked Nakia Greer about Ms. Watkins, and Mr. Greer told Mr. Brown that Ms. Watkins had gone to the store and that she would be back. Mr. Brown also told Mr. Greer that "it was a gram of weed, and it's not a half ounce of weed that he had put in Dena Watkins' hand." Mr. Williams testified that Mr. Brown and Mr. Greer argued back and forth, and when they got loud, Mr. Williams intervened and told Mr. Brown to leave and come back in five to ten minutes. He also told Mr. Brown that he would pay for any drugs that Ms. Watkins took if she did not return.

Ms. Watkins returned to Mr. Williams' house, denied taking the drugs, and then left. Mr. Williams testified that Ms. Watkins passed Kenneth Brown as he returned with Mr. Richardson and Defendant in the car. Kenneth Brown asked if Ms. Watkins had returned, and Mr. Greer informed Kenneth Brown that he has just passed Ms. Watkins as she was leaving. Mr. Williams then gave Kenneth Brown five dollars worth of change and asked him to leave. As Kenneth Brown was leaving, his car nearly hit Robrecus Braxton who threw a beer that he was drinking into the car. Kenneth Brown pulled his car up to Ladue Street, and he and the other two men in the car got out and began fighting with Robrecus Braxton, Christopher Braxton, and Kenneth Baker. Mr. Williams attempted to break up the fight which eventually ended when Kenneth Brown's car window got broken. Kenneth Brown and the other men got back into the car, and Mr. Brown said, "We'll be back."

Mr. Williams testified that after the fight ended, the green Lumina that Kenneth Brown had been driving circled by Mr. Willliams' house three or four times. Mr. Williams testified that he also saw Mr. Kenneth Brown's mother's SUV drive through the neighborhood.

Mr. Williams testified that approximately four to five hours after the fight ended, he walked out of the house with the victim, who was his niece. They proceeded down the driveway to the sidewalk and stopped. The two talked, and the victim told Mr. Williams that she loved him and that she would be back the following day. Mr. Williams thought that Travis Britton had arrived to pick up the victim and take her home. Mr. Williams turned around and was walking back down the driveway when he saw a bottle rocket strike his wife's Dodge Durango, and a second bottle rocket struck his arm. Approximately one minute later Mr. Williams heard gunshots, and he ran through the carport area and fell into a pool. He said that several individuals were standing under the carport at the time, including his sons. Mr. Williams then crawled from the pool to the back yard where he encountered "Pootie" who indicated that he had been shot.

Mr. Williams testified that gunshots were still hitting the house, and he ran into the house to take care of his wife and children. By that time, Mr. Williams' wife, Sonja Watkins, had the children in a back room and covered them with a mattress. "Pootie," who was bleeding, was also in the house. Mr. Williams estimated that sixty to seventy shots were fired at the house before the shots ended. He did not see the shooters. Mr. Williams walked out the door and heard Bianca Nevels asking for someone to go out and check on the victim, her sister, who was not moving. Mr. Williams walked out into the yard and saw the victim lying on the ground, and several people, including Mr. Williams' wife, were talking to the victim. Mr. Williams walked away and dialed 9-1-1. Undercover officers and other police officers then arrived on the scene. Mr. Williams told them about the fight that occurred earlier. Mr. Williams was later shown a photographic lineup at the Memphis Police Department. He identified Kenneth Brown, and David Richardson as two of the men fighting with Robrecus Braxton prior to the shooting.

Dr. James Caruso performed an autopsy on the victim. He determined that she died from a gunshot wound to the head. Dr. Caruso recovered fragments of the bullet from the victim's brain, and they were sent to law enforcement personnel.

Officer Demar Wells, a crime scene investigator with the Memphis Police Department, testified that he was dispatched to the scene at 2706 Northmeade Avenue on July 3, 2010. He noted that numerous spent shell casings were located on the sidewalk in front of 3840 Helmwood Street located three houses away from the Northmeade location. Officer Wells testified that the following shell casings were recovered from the Helmwood location including "thirty-two .30 [caliber] spent casings, eight .45-caliber spent casings, twenty-five LC05 spent casings, and three 20-gauge shell casings." Officer Wells testified that he also recovered shell casings at 2706 Northmeade Avenue which included "six 7.62 x 39 spent casings, two bullet fragments and nine spent .9-millimeter Ruger casings."

Concerning the scene, Officer Wells testified:

There were several houses struck in the immediate area surrounding 2706 Northmeade, multiple vehicles were struck, with property damage sustained to the homes and to the vehicles, and I also observed a puddle of what appeared to be blood at 2706 Northmeade near the driveway and the curb where the victim possibly came to rest.

He also observed what appeared to be blood on the kitchen floor inside the house. There was a possible bullet hole in a wall and possible bullet holes in a window. Sergeant Marlon Wright also assisted with collecting the evidence, sketching, and photographing the scene.

Officer Jeff Garey, a crime scene investigator, testified that he tested the shell casings recovered at 3840 Helmwood Street for fingerprints but did not find any. Officer Gary also searched a Buick Roadmaster belonging to Mark and Steve Chambers. Two .9 millimeter pistols were located inside the car.

Lieutenant Deborah Carson testified that she was working in the Homicide Bureau in July of 2010 and was assigned to investigate the victim's death. She went to the Medical Examiner's office and retrieved evidence recovered from the victim including: "[b]ullet fragments, fingernail clippings, GSR kit." The evidence was later transported to the Tennessee Bureau of Investigation (TBI) for examination along with shell casings and two weapons from the case.

Sergeant William Merritt of the Memphis Police Department, Homicide Bureau, was assigned as case coordinator in the present case. During the investigation he received Defendant's name as a suspect in the shooting. On July 5, 2010, Defendant arrived at the Homicide Bureau office with his mother and was initially interviewed by Sergeant Moses and Sergeant Brown. Sergeant Merritt then interviewed Defendant later that evening. Sergeant Brown was also in the room during the interview. Defendant was advised of his *Miranda* rights prior to the interview, and he agreed to give a statement. Defendant told Sergeant Merritt and Sergeant Brown that he was unsure if he was responsible for the victim's death. He admitted that he was armed with a black shotgun at the time of the shooting and that he fired three shots. He did not know if he struck anyone when he fired the shotgun. Defendant said that his brother (Kenneth Brown) and David Richardson were also present during the shooting at 2706 Northmeade Avenue. Mr. Brown had a revolver and Mr. Richardson had a "chopper," an assault rifle, at the time. Defendant thought that Mr. Brown fired four to five shots, and Mr. Richardson fired ten to fifteen shots. Defendant told Sergeant Merritt and Sergeant Brown that he, Kenneth Brown, and Mr. Richardson were in Kenneth Brown's green Chevrolet Lumina at the time of the shooting.

Concerning the shooting, Defendant said:

We had rode past the house and we didn't see nobody standing out until we got like to the other side of the house. It was like thirty people standing out and as we were riding past, we were looking up there, but we didn't fire no shots or nothing. We got like halfway past they [sic] house and then that's what [sic] I thought was fireworks were shots being fired towards my brother's - - or towards my brother [sic] car. That's when the back windshield got shot out. When the back windshield got shot out, that led us to get out of the car and start shooting back in self-defense. We had got back in the car and drove off after the shooting.

Defendant then told the officers that the guns used during the shooting were at his house located at 2739 Cracklerose Drive. Sergeant Merritt obtained a search warrant for the residence, but the weapons were not found in the house.

Mark Chambers testified that he was at 2706 Northmeade Avenue on July 3, 2010, attending a barbecue. He, Lamarcus Moore, and a third person arrived at the house between 3:00 and 4:00 p.m. Mr. Chambers testified that some time later he was sitting under the carport when he heard what sounded like fireworks, and then everyone began "running, yelling, 'They shooting, they shooting,' and stuff like that.'" He said that it was dark outside when the shots were fired. Mr. Chambers then heard that his nephew, Lamarcus Moore, had been shot. Mr. Chambers crawled inside the house and retrieved two guns, a "nine Ruger and a .9 millimeter Smith and Wesson." Mr. Chambers walked outside and began firing back in the direction of the shooters. He eventually found Lamarcus Moore, and he, Steve Chambers, and Cleotha Norwood carried Mr. Moore to Mr. Chambers' car. Shots were still being fired while the men carried Mr. Moore to the car. Mr. Chambers placed his two guns in the car, and he, Steve Chambers, and Mr. Norwood drove Mr. Moore to the "Med." Mark Chambers estimated that he fired seven to ten shots from each of his two guns during the shooting.

Steve Chambers testified that he was standing under the carport with many other people when the shooting began. At first he thought that someone was shooting fireworks. He said that everyone ran behind the house when they realized that someone was firing gunshots. Steve Chambers testified that before the shooting began, he saw the homicide victim walking across the yard toward her truck. He eventually went into the house during the shooting and saw his nephew, Lamarcus Moore, lying on the floor. He learned that Mr. Moore had been shot. Steve Chambers testified that he heard at least fifty or more shots fired during the shooting. He said that during the shooting, he went with Mark Chambers and Cleotha Norwood, who carried Mr. Moore out to the car. Steve Chambers testified that his brother, Mark Chambers, dropped one of his guns as he was taking Mr. Moore to the car, and Steve Chambers picked it up and fired two times to ensure that they made it to the car. Steve Chambers testified that Mark Chambers initially drove the car, but they later switched drivers, and Steve Chambers drove Mr. Moore to the hospital. Steve Chambers testified that the homicide victim "got hit first, when they first started shooting." He saw her lying in the yard and heard someone screaming that she had been shot. Steve Chambers did not recall later telling investigators that he fired five or six shots from Mark Chambers' gun.

Inga Yancey testified that she was living at 3840 Helmwood Street in July of 2010. On July 3-4, 2010, Ms. Yancey was sleeping when she heard what she thought was "firecrackers" after midnight. Ms. Yancey got up and opened her side door and called for her dog. She then laid back down and did not hear any further sounds. Ms. Yancey testified

that police later knocked on her door before 1:00 a.m.  She had never previously seen shell casings in her yard.

Hope Smith, a crime scene officer with the Memphis Police Department, testified that she processed a green Chevrolet Lumina on July 5, 2010.  She did not find any shell casings, bullets, or weapons in the vehicle.   Officer Smith removed paperwork, a bowl, and a switchblade knife from the vehicle.  There was also a droplet of what appeared to be blood on the back seat.  Officer Smith testified that the paperwork "was a Violation of Registration ticket and a traffic violation receipt, both in Kenneth Brown and Villamena Love's name." Officer Smith did not find any bullet holes on the outside or the inside of the vehicle.

Lamarcus Moore testified that he was at 2706 Northmeade Avenue on July 3, 2010, attending a party.  His uncles, Mark and Steve Chambers were also there.  Concerning the shooting, Mr. Moore testified:

> We was there in the - - like I said, I was hearing about all that fighting and stuff, and I end up seeing cars and stuff, riding back and forth past, and people paying attention to the cars.  And I was there telling my uncle and them I was ready to go 'cause I heard about all that fighting and stuff, so - - and - - so we could get out of the way of it, you know what I'm saying?  And then after like later on that day, some folks started shooting, and that's what happened.

Mr. Moore testified that the shots sounded like they were fired from different weapons.  He also testified that it sounded like someone fired bottle rockets before the shooting began.  Mr. Moore was running toward the backyard when he was shot.  He then ran inside the house. Mr. Moore testified that the bullet struck his leg, and he had two surgeries.  He said, "The bullet's still in my leg."

Sonja Watkins testified that she was preparing for a fourth of July celebration at her home on July 3, 2010.  As the day progressed, Ms. Watkins was notified by her stepdaughter that someone was outside fighting.  Ms. Watkins ran outside and saw the fight but she could not tell who was involved.  She said that everything was "chaotic" at the time and that "it was three guys here and my people here, and they were just in - - back and forth, just in each other [sic] faces when I got out there."   At some point the fight ended, and Ms. Watkins told her guests to stay in the yard.  She then walked back inside the house.

Ms. Watkins had just finished her daughter's hair  "[s]ome hours later," when she heard noises.  She thought that someone was already shooting fireworks but then realized that it was gunshots.  Ms. Watkins testified, "I knew right then that the people that they was fighting with had come back because they made those remarks that they'll be back."  Ms.

Watkins ran to the back of the house to check on the children and get them on the floor under some tables. She ran back down the hallway and saw Lamarcus Moore who had been shot. Ms. Watkins testified that she ran out to the carport and encountered her niece who was limping because she had been "hit." Ms. Watkins' niece also asked her to check on the homicide victim, who would not get up. She found the homicide victim lying on the ground with a wound to her head. At the time, the homicide victim still had a pulse. Ms. Watkins testified that when the shooting occurred D.L.(A) (age one), D.L.(B) (age three), A.L. (age four), D.L.(C) (age five), S.K. (age six), and W.H. (age eleven) were inside the house. Ms. Watkins testified that the following family members were also at the house: "Robrecus Braxton, Christopher Braxton, Felix Williams, Portia Williams, Bianca Nevels, DeAngelo Smith, Kimea Baker, Jalon Baker, Terriance Webb, Lakia Greer, Steve Chambers, Mark Chambers, Lamarcus [Moore], Travis Britton, Rodney Davenport, [and] Cleotha Norwood."

Special Agent Steve Scott of the TBI Crime Lab's Firearms Identification Unit received two handguns, two pistols, several cartridge cases, fired cartridge cases, and fired bullets collected during the investigation in the present case. Special Agent Scott testified that there were thirty-two 30-caliber cartridge casings recovered from 3840 Helmwood Street, which had been fired from the same weapon, a carbine-style weapon. There were eight .45-caliber shell casings recovered from the Helmwood Street address were also fired from the same weapon, a pistol. Special Agent Scott testified that there were twenty-five .223 Remington shell casings recovered from the Helmwood Street address but no weapon was recovered to match them. Therefore Special Agent Scott could not tell if the casings were all fired from the same weapon, which would have been an "assault-style" weapon. The casings were consistent with bullet fragments found at the crime scene.

Special Agent Scott testified that three 20-gauge shotgun shell casings were recovered from the Helmwood Street address which were all fired from the same weapon. There were also bullet fragments which were consistent with having been fired from a .30 caliber rifle and a .22 caliber rifle. Special Agent Scott determined that all of the 7.62 millimeter shell casings had been fired from the same rifle, which commonly was referred to as an assault-style weapon. There were six 9 millimeter shell casings that had been fired from the same pistol that was recovered from the gun found in the Chambers' vehicle, and all of the casings from the crime scene were consistent with the fact that four weapons were used in the assault. Special Agent Scott testified that all of the casings would have been deposited in the area where the weapons were fired. Special Agent Scott also testified that after examining all of the ballistics proof, it was his opinion that the victim was killed by gunfire from a .30 caliber rifle.

## II. Analysis

### I.  Motion to Suppress

Defendant contends that the trial court erred in failing to grant his motion to suppress the statement he gave to police.  He contends that his statement was "the product of an illegal arrest, detention and interrogation by Memphis Police Officers in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, section 7, of the Tennessee Constitution as well as Rule 5(a) of the Tennessee Rules of Criminal Procedure." More specifically, Defendant argues that he was arrested without a warrant and without probable cause to support a warrant and that the detectives "unnecessarily delayed a proper judicial determination of probable cause following arrest."  We disagree.

In *Echols*, our Supreme Court set forth the following standard of review for suppression hearings:

> [T]he standard of review applicable to suppression issues is well established. When the trial court makes findings of fact at the conclusion of a suppression hearing, they are binding upon this Court unless the evidence in the record preponderates against them. Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence* adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

> Our review of a trial court's application of law to the facts is de novo with no presumption of correctness. Further, when evaluating the correctness of the ruling by the trial court on a motion to suppress, appellate courts may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial.

*State v. Echols,* 382 S.W.3d 266, 277 (Tenn. 2012) (emphasis added) (citations omitted). Because the State prevailed at the suppression hearing in this case, we afford the State the strongest legitimate view of the evidence.

Concerning the issue of whether Defendant was arrested without a warrant and without probable cause to support a warrant and that the detectives "unnecessarily delayed a proper judicial determination of probable cause following arrest," the trial court in the present case made extensive findings. The trial court noted that Defendant voluntarily went to the homicide bureau office with his mother. He was not restrained when he initially arrived at the office, and there was a difference of opinion between Sergeants Merritt and Brown as to whether Defendant was free to leave prior to giving his second statement. The trial court found that Defendant was not free to leave after telling detectives to check out his alibi because he was considered a suspect in the crime. The trial court also found that Defendant was properly arrested and charged after he gave the second statement and that there was sufficient corroboration for Co-defendant Richardson's statement, and therefore, police had probable cause to arrest defendant even if he had chosen not to come to the homicide bureau voluntarily. The trial court concluded that Defendant's statement was voluntarily given and not the product of coercion. The trial court also concluded that Defendant was "detained" at approximately 1:30 on July 5, 2010, when he arrived at the homicide bureau office.

Concerning the length of Defendant's detention, the trial court found that because Defendant was only initially detained, there was no need to present him to a magistrate pursuant to Tenn. R. Crim. P. 5. The trial court also pointed out that the courts were closed on Monday, July 5, 2010, for the holiday with the exception of magistrates who could only issue search warrants. The affidavit of complaint was presented to a judge on Tuesday, July 6, 2010.

Defendant initially argues that he was detained upon his arrival at the homicide bureau without a warrant or probable cause sufficient to support the issuance of a warrant. We disagree. The proof shows that although Defendant had been developed as a suspect in the shootings, he arrived at the homicide bureau voluntarily with his mother on July 5, 2010, at approximately 1:30 p.m. Defendant was advised of his *Miranda* rights, and he provided an alibi statement. Sergeant Merritt directed Sergeants Brown and Moses to follow up on that information. Sergeant Merritt testified that the alibi, Defendant's minor girlfriend, was contacted, and her mother agreed to bring her to the homicide office later on. That evening, Sergeant Merritt learned that defendant's girlfriend was unable to corroborate Defendant's alibi. She indicated that Defendant had asked her to say that she was with Defendant at the time of the shooting. Sergeant Merritt testified:

> [Defendant] was not handcuffed at that point. He - - we were getting information from him in order to verify his story because if we have an alibi witness that can completely clear his name, then that's good for him. He doesn't have to be taken into custody, he doesn't have to be charged, and

-14-

we're obligated to check his side of the story, just like were obligated to check the Co-Defendant's side of the story. We're trying to either verify or refute the information that the Co-defendant told us, and that would be to speak with the alibi witness, and the alibi did not hold up.

Sergeant Merritt testified that he and Sergeant Brown sat down with Defendant and advised him of his rights a second time, and obtained a statement. Defendant was calm and cooperative at the time. Sergeant Brown testified that after Defendant learned that his alibi had been refuted, he immediately indicated that he wanted to tell the truth. He then stated that he was present for the shooting and fired a shotgun.

Sergeant Merritt noted that Defendant "had been at our office for a while waiting for us to talk to him, waiting for us to follow up on his alibi, and that's, you know, what we were doing while he was up there." Sergeant Merritt testified that if Defendant had refused to give a statement at any time the interview would have stopped. He further noted that Defendant "would have been offered restroom breaks, and you know, probably something to drink if he had asked." Defendant gave a typed statement at 7:50 p.m. on July 5,2010, and he signed the statement at 8:25 p.m. indicating his involvement in the shooting.

Sergeant Merritt admitted that Defendant's arrest ticket and the forty-eight-hour hold document indicated that Defendant was placed under arrest at 1:30 p.m. on July 5, 2010; however, Sergeant Merritt testified that Defendant was not under arrest at the time and that the time reflected on the ticket was when Defendant arrived at the homicide bureau office. Sergeant Merritt thought that the time of 1:30 was "either a typographical error or there may have been a co-worker that typed this information here in the top, and I should have checked it closer and that's my mistake." He and Sergeant Brown said that Defendant was not placed under arrest until he gave the statement. Sergeant Merritt testified that Defendant was free to leave when he initially arrived at the office with his mother. However, Sergeant Brown testified that Defendant was detained while his alibi was being investigated.

Defendant contends that he was detained when he arrived at the police station without a warrant or probable cause sufficient to support the issuance of a warrant, and the trial court found that Defendant was detained. The State, however, argues that Defendant was not "seized" at the time. Regardless of when Defendant was detained, there was probable cause to support an arrest prior to Defendant's arrival at the homicide bureau.

In *Bishop*, our Supreme Court recently stated,

Probable cause exists when "at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had

reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." *State v. Echols*, 382 S.W.3d at 277-78 (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)) (alterations and internal quotation marks omitted). It requires "more than a mere suspicion." *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005). Instead, a probable cause inquiry focuses on probabilities rather than technicalities and is grounded in the factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act. *State v. Melson*, 638 S.W.2d 342, 351 (Tenn. 1982) (quoting *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)).

The United States Supreme Court has noted that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (internal quotation marks omitted). We long ago explained that

> [a] narrow construction [of the probable cause standard embedded in Tenn. Code Ann. § 40-7-103(a)(3) ] would open the way for the escape of desperate criminals and the defeat of justice. One too liberal would lead to the harassment of the innocent. But the officer may not be required to wait for assurance, for evidence which would convict; when circumstances fairly point to a felony it is his duty to act, and act promptly.

*Dittberner v. State*, 155 Tenn. 102, 106, 291 S.W. 839, 840 (1927).

When determining whether the police possessed probable cause, the courts should consider the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer or officers who possessed relevant information. Such a nexus exists when the officers are relaying information or when one officer directs another officer to act. *State v. Echols*, 382 S.W.3d at 278; 2 LaFave § 3.5(a)-(c). It matters not whether the arresting officers themselves believed that probable cause existed. *State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn. 1996) ("*[An officer's] subjective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed*."). When determining the existence of probable cause, the courts should also consider the entire record,

including the proof adduced at both the suppression hearing and the trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

*State v. Bishop*, 431 S.W.3d 22, 36-37 (Tenn. 2014)(*emphasis added*). "[R]easonable cause" is synonymous with "probable cause." *State v. Echols*, 382 S.W.3d at 278.

Prior to Defendant's arrival at the homicide bureau, Co-Defendant David Richardson had identified Defendant as one of his accomplices in the shooting. Sergeant Merritt testified that he was aware that Mr. Richardson had ties to Defendant's family, and he noted that the green Lumina belonging to Defendant's mother was found at Mr. Richardson's home. Defendant's mother's cell phone number was found in Mr. Richardson's phone, and Mr. Richardson identified photographs of Defendant and Defendant's brother, Kenneth Brown. Mr. Richardson admitted his involvement in the shooting.

To issue an arrest warrant based on probable cause from information coming from someone in the "criminal milieu," probable cause must be based on the two-pronged test announced by the United States Supreme Court in *Spinelli v. United States*, 393 U.S. 410, 416 (1969), and *Aguilar v. Texas*, 378 U.S. 108, 114 (1964). In *Bishop*, the Tennessee Supreme Court noted:

> When applying the *Aguilar-Spinelli* test, a statement from a professional, "criminal milieu," or an anonymous informant can provide probable cause only if the State demonstrates a strong "basis of [the informant's] knowledge" and the "veracity" of the information. The "basis of knowledge" prong involves how the informant came to know the information he or she claims to know. The "veracity" prong requires facts that demonstrate either that the informant is personally credible or that the information itself is reliable. The credibility of the informant's information may also be buttressed by independent corroboration of its details. However, it is not necessary to corroborate every detail of the informant's information, *State v. Jacumin*, 778 S.W.2d at 432, 436, or to "directly link the suspect to the commission of the crime." Corroboration of "only innocent aspects of the story" may suffice. *State v. Melson*, 638 S.W.2d at 355 (quoting *United States v. Rollins*, 522 F.2d 160, 164-65 (2d Cir. 1975)); *see also State v. Smotherman*, 201 S.W.3d 657, 664 (Tenn. 2006).
>
> In *State v. Jacumin*, we cautioned against "excessively technical" applications of the *Aguilar-Spinelli* test because the test is intended to be a guide, rather than a set of "inflexible, independent requirements in every case." *State v. Jacumin*, 778 S.W.2d at 433 (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 n. 6, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1989)). We recognized that magistrates and law

enforcement officers making probable cause determinations are "practical people" striving to formulate "common-sense conclusions about human behavior." *State v. Jacumin*, 778 S.W.2d at 432 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). As the Court of Criminal Appeals has noted, "judicial application of constitutional standards, or any legal standard, in [a] hypertechnical fashion tends to demean our system of justice and to weaken society's confidence in it." *State v. Moon*, 841 S.W.2d 336, 342 (Tenn. Crim. App. 1992).

*State v. Bishop*, 431 S.W.3d at 38 (Tenn. 2014). The supreme court further held:

We have never addressed directly whether the statements of a person who confesses to a crime and implicates another in the process should be considered presumptively reliable. The Court of Criminal Appeals has determined that such a confession should not be considered to be presumptively reliable. *See State v. Lewis*, 36 S.W.3d 88. 99 (Tenn. Crim. App. 2000)(holding that a *Jacumin* analysis is necessary" when the informant is the defendant's accomplice). We agree with this conclusion.

*State v. Bishop*, 431 S.W.3d at 39.

In this case, we find that Mr. Richardson possessed a strong "basis of knowledge" for identifying Defendant as an accomplice as he admitted to his own involvement in the shooting. We also find that the reliability prong of *Aguilar-Spinelli* was satisfied by Mr. Richardson's statement against penal interest, and as noted above Mr. Richardson had ties to Defendant's family, the green Lumina belonging to Defendant's mother was found at Mr. Richardson's home, Defendant's mother's cell phone number was found in Mr. Richardson's phone, and Mr. Richardson identified photographs of Defendant and Defendant's brother, Kenneth Brown. We again point out that "corroboration of every detail of an informant's information is not required," and the "strength of the evidence necessary to establish probable cause to arrest is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." *State v. Bishop*, 431 S.W.3d at 41. Therefore, we conclude that there was probable cause to arrest Defendant prior to his arrival at the homicide bureau office regardless of when he was detained.

Next, Defendant contends that the State violated Tenn. R. Crim. P. 5(a) which provides:

Any person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest

-18-

appropriate magistrate of the county from which the warrant for arrest issued, or the county in which the alleged offense occurred if the arrest was made without a warrant unless a citation is issued pursuant to Rule 3.5.

Concerning the legality of a detention, the supreme court in *Bishop* noted:

When a person is arrested without a warrant, the law requires the arresting authorities to take him or her before a magistrate to "seek a prompt judicial determination of probable cause." *Gerstein v. Pugh*, 420 U.S. at 125, 95 S.Ct. 854; *State v. Huddleston*, 924 S.W.2d at 668; *see also* Tenn. R. Crim. P. 5(a)(1) (stating that "[a]ny person arrested - except upon a capias pursuant to an indictment or presentment - shall be taken without unnecessary delay before the nearest appropriate magistrate"). In Tennessee, these " *Gerstein* hearings" also typically include an assessment of pretrial bail. *State v. Huddleston*, 924 S.W.2d at 672 n. 2.

While a delay of less than forty-eight hours is presumptively reasonable, a delay beyond forty-eight hours requires the State to prove that "a bona fide emergency or other extraordinary circumstance" caused the delay. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Even so, a delay shorter than forty-eight hours may still be considered unreasonable, and hence unconstitutional, if the delay is "for the purpose of gathering additional evidence to justify the arrest" or if the delay is "motivated by ill will against the arrested individual, or delay for delay's sake." *County of Riverside v. McLaughlin*, 500 U.S. at 56, 111 S.Ct. 1661.

In *Huddleston*, this Court determined that "the exclusionary rule should apply when a police officer fails to bring an arrestee before a magistrate within the [48 hours] allowed by *McLaughlin*." *State v. Huddleston*, 924 S.W.2d at 673. Thus, under the "fruit of the poisonous tree" doctrine, this Court held that any evidence obtained by virtue of a suspect's unlawful detention must be excluded from trial unless the arrested person's statement was "sufficiently an act of free will to purge the primary taint" of the illegal detention. *State v. Huddleston*, 924 S.W.2d at 674-75 (quoting *Brown v. Illinois*, 422 U.S. 590, 598, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

We also explained in *Huddleston* that when a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it "ripens" into a *Gerstein* violation. *State v. Huddleston*, 924 S.W.2d at 675 ("Initially, detention is not illegal, but later ripens into a constitutional violation.").

-19-

"Obviously," we noted, "if the [arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *State v. Huddleston*, 924 S.W.2d at 675.

*State v. Bishop*, 431 S.W.3d at 42.

In this case, Defendant voluntarily came to the homicide bureau with his mother at 1:30 p.m. on July 5, 2010. At that point, there was probable cause to arrest Defendant. At that time, Defendant gave detectives the name of an alibi. Sergeant Merritt said that Defendant had "been at our office for a while waiting for us to talk to him, waiting for us to follow up on his alibi, and that's, you know, what we were doing while he was up there." Defendant then gave a second typed statement at 7:50 p.m. on July 5, 2010, and he signed the statement at 8:25 p.m. indicating his involvement in the shooting. There is no showing that the delay in this case was unreasonable or that if it was unreasonable, that Defendant's second statement was the product of the unreasonable delay. The second statement was given within seven hours after his voluntary arrival at the homicide bureau, well within the forty-eight hour window in *McLaughlin*. Any delay in a judicial determination in this case was not shown to be "for the purpose of gathering additional evidence to justify the arrest," or "motivated by ill will against the arrested individual or delay for delay's sake." *Id.* The officers were simply trying to verify Defendant's alibi. We also note, as pointed out by the State, that the trial court found that any delay between the second statement and Defendant's court appearance was due to the fourth of July holiday schedule for General Sessions Judges.

Based on our review of the totality of the circumstances surrounding the giving of Defendant's statement, we conclude that the evidence does not preponderate against the trial court's finding that admission of Defendant's statement did not violate Fourth Amendment principles. The trial court properly denied Defendant's motion to suppress, and Defendant is not entitled to relief on this issue.

## II.     Sufficiency of the Evidence

Next, Defendant challenges the sufficiency of the evidence for his convictions for first degree premeditated murder and attempted first degree murder. He also argues that there was no proof that Kenneth Baker or Chymia Baker were present during the shooting and therefore, those the indictments charging him with attempted first degree murder and aggravated assault and naming them as victims should be dismissed. Finally, Defendant asserts that his confession was not sufficiently corroborated.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

First degree murder is defined as the intentional and premeditated killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (2006). Defendant challenges the sufficiency of the evidence to establish premeditation. In order to sustain a conviction for attempted first degree premeditated murder, the State must prove that Defendant acted with the intent to commit premeditated first degree murder and that his conduct constituted a substantial step toward the commission of the offense. Tenn. Code Ann. § 39-12-101(a)(3).

Premeditation is defined as "an act done after the exercise of reflection and judgment" and committed after the accused "was sufficiently free from excitement and passion as to be capable of premeditation." Tenn. Code Ann. § 39-13-202(d) (2006). The presence of premeditation is a question of fact for the jury to determine based on a consideration of all of the evidence. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Addison*, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

Viewing the evidence in a light most favorable to the State, the proof showed that Defendant and Co-defendants Kenneth Brown and David Richardson were involved in an altercation with several individuals at Felix Williams' home located at 2706 Northmeade Avenue, including Robrecus Braxton, Christopher Braxton, and Kenneth Baker. After the fight was over, Mr. Brown indicated that they would be back. Mr. Braxton testified that the men said, "All right. That's what's up. That's what's up," which Mr. Braxton took as a threat. Mr. Williams testified that he later saw the green Lumina that Mr. Brown had been driving circle by the house three or four times. He also saw an SUV belonging to Defendant and Kenneth Brown's mother drive through the neighborhood.

Defendant, Mr. Brown, and Mr. Richardson returned in the green Lumina three to four hours after the fight ended armed with a shotgun, an assault rifle, and a pistol. They parked down the Street from the Williams' residence on Helmwood Street and released a barrage of gunfire on a group of individuals at the Williams' home in retaliation for the fight killing the unarmed victim who was walking to her vehicle. It was later determined that she died from a gunshot wound to the head. Lamarcus Moore was struck by a bullet in the leg and had to be taken to the hospital, and there were women and several children inside the house when the shooting occurred. Bullet holes were later discovered in the house. Defendant was interviewed by police and admitted that he was armed with a black shotgun at the time of the shooting and that he fired three shots. He said that Mr. Brown was armed with a revolver and Mr. Richardson was armed with an assault rifle. Defendant admitted that there "was like thirty people standing out" as they drove past the residence. He told the detectives that the weapons were located at his house; however, the residence was searched, and the weapons were not found. The following shell casings were recovered from the Helmwood location by crime scene officers including "thirty-two .30 [caliber] spent casings, eight .45-caliber spent casings, twenty-five LC05 spent casings, and three 20-gauge shell casings." Shell casings recovered from 2706 Northmeade Avenue included "six 7.62 x 39 spent casings, two bullet fragments and nine spent .9-millimeter Ruger casings."

In his statement, Defendant told Detectives that he, Mr. Richardson, and Mr. Brown began firing their weapons in self-defense because someone shot the back window out of Mr. Brown's car as they drove past the Williams' residence. However, Officer Hope Smith processed Mr. Brown's car and did not find any shell casings, or bullets inside the vehicle, and she did not find any bullet holes on the outside or in the inside of the vehicle.

Given the testimony presented by the State's witnesses that Defendant, Mr. Brown, and Mr. Richardson joined together to retaliate against the victims for the earlier fight by arming themselves with weapons and returning to the Williams' residence, as they had threatened to do in Mr. Braxton and Mr. Williams' presence, and firing numerous shots at the individuals

at the residence, a reasonable jury could find that the State had proven the element of premeditation.

Defendant also argues that the proof was insufficient to show that Kenneth Baker or Chymia Baker were present during the shooting and therefore, those the indictments charging him with attempted first degree murder and aggravated assault and naming them as victims should be dismissed. However, Robrecus Braxton testified that both individuals were at the residence and that Kenneth Baker was one of the individuals involved in the fight with Defendant, Mr. Brown, and Mr. Richardson.

Finally, Defendant contends that there was no proof to corroborate his statement. A criminal conviction cannot be based solely on a defendant's uncorroborated confession. *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). The Tennessee Supreme Court recently adopted the "modified trustworthiness standard" in determining whether a confession is sufficiently corroborated. *State v. Bishop*, 431 S.W.3d 22, 58 (Tenn. 2014).

In *Bishop*, the supreme court explained,

Under the modified trustworthiness standard, a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury." *State v. Lucas*, 152 A.2d at 60. When the crime is of a type that does not result in a tangible injury, "the corroborative evidence must implicate the accused in order to show that a crime has been committed." *Smith v. United States*, 348 U.S. at 154, 75 S.Ct. 194; *United States v. Brown*, 617 F.3d at 862-63.

The modified trustworthiness standard is not a lesser standard than the traditional *corpus delicti* rule. Its focus is different. While the traditional rule required only "slight" evidence of the corpus delicti, the trustworthiness standard requires "substantial" independent evidence to bolster a defendant's extrajudicial confession or admission. *Opper v. United States*, 348 U.S. at 93, 75 S.Ct. 158; *Smith v. United States*, 348 U.S. at 75, 75 S.Ct. 194. Because the forces of the modified trustworthiness standard is different, the following guidelines will help the bench and bar apply this standard in future cases.

Here is the "modified trustworthiness" corroboration test in a nutshell. When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the

-23-

charged offense is one that involves a tangible injury. If the answer is yes, then the State must prove substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy and the evidence must link the defendant to the crime.

*State v. Bishop*, 431 S.W.3d at 58.

Independent corroboration of one key part of an extrajudicial confession may corroborate the entire statement. Also, the State may bolster an extrajudicial confession or admission by presenting evidence showing that a defendant's statement reveals "'specific personal knowledge about the crime.'" *State v. Bishop*, 431 S.W.3d at 59-60. Once the State presents independent evidence establishing the prima facie trustworthiness of a defendant's extrajudicial confession, the existence of contradictory evidence does not necessarily render the confession untrustworthy. Additional extrajudicial confessions by a defendant are not sufficient by themselves to establish trustworthiness. *Id*. at 61.

In this case, there was sufficient evidence to corroborate Defendant's statement. Robrecus Braxton and Felix Williams testified that Kenneth Brown and Mr. Richardson returned to the residence before the fight with Defendant, Kenneth Brown's brother. In his statement to police, Defendant stated that he fired three blasts from a shotgun while Kenneth Brown used an assault rifle, and Mr. Richardson used a pistol. The ballistics proof at trial confirmed that there were three shotgun shells recovered as well as numerous shell casings from an assault weapon and a pistol. Furthermore, as pointed out by the State, the car used in the crime and driven by Kenneth Brown belonged to Kenneth Brown and Defendant's mother. This issue is without merit.

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions for first degree premeditated murder, attempted first degree murder, and also for all other convictions in this case. Defendant is not entitled to relief on this issue.

*III. Sentencing*

Finally, Defendant argues that the trial court erred in sentencing him. More specifically, he contends that the trial court erred in ordering all of his sentences to be served consecutively.

-24-

In *State v. Bise,* the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 709 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn.1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707. We note that even a trial court's misapplication of an enhancing or mitigating factor in passing sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709.

Defendant argues that the trial court improperly imposed consecutive sentencing. Our supreme court has recently held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations" "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *State v. Pollard*, 432 S.W.3d 851, 861-62 (Tenn. 2013). Thus, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2) & (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id*. at *9 (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal.")); *see also State v. Bise*, 380 S.W.3d 682, 705 (Tenn. 2012).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) **The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;**

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

(*Emphasis added*).

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. When ordering consecutive sentences pursuant to factor (4), the trial courts are directed to make two additional findings: (1) that the terms imposed are reasonably related to the severity of the offenses committed; and (2) that consecutive sentences are necessary in order to protect the pubic from further criminal acts by the offender. *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

In this case, the trial court made the following findings concerning consecutive sentencing:

For [Defendant], as indicated, the same findings that the Court made on Mr. Kenneth Brown, that [Defendant] is, in fact, a dangerous offender who[se] behavior indicates little or no regard for human life, that [Defendant] had no hesitation about committing a crime in which the risk to human life was, in fact, high, and the Court further finds that the circumstances surrounding the commission of this offense are, in fact, aggravated, and that the aggregate length of the sentences does reasonably relate to the severity of the offenses for which [Defendant] stands convicted, and this Court finds, pursuant to the *Wilkerson* factors, that consecutive sentences are necessary to protect this community from further acts of violence.

As indicated earlier, this is a case that, God forbid, many, many, other people could have been killed, could have been injured, by what is absolutely an unconscionable act committed by three people, perhaps four, over a five dollar ($5) amount of marijuana that was allegedly taken from Kenneth Brown and a fistfight that he lost, and as a result of this, these folks turned Memphis, Shelby County, Tennessee into a war zone. This is something that you don't want to turn your TV on and see what's going on in foreign third world countries, and it certainly should not be happening in this community, and this Court finds that consecutive sentences are, in fact, absolutely necessary in [Defendant's] case . . ."

The records supports the trial court's findings, and the trial court properly considered all of the principles of sentencing. We conclude that the sentencing decision was "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE